UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JAMES ANTHONY GREEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CAUSE NO. 3:09-CV-571 WL |
| v. | ) |
| | ) |
| NURSE CARROLL, | ) |
| | ) |
| Defendant. | ) |

OPINION AND ORDER

James Anthony Green ("Green"), a *pro se* prisoner, was granted leave to proceed on a claim that defendant Carol Warnock ("Warnock"), named in the complaint as "Nurse Carroll," was deliberately indifferent to his medical needs on January 2, 2009, when she failed to provide him with medical treatment for pain and numbness in his feet and legs. (DE 14.) Warnock now moves for summary judgment. (DE 46.)

I. FACTS

The following facts are undisputed. Green arrived at Westville Correctional Facility ("Westville") on October 12, 2008. (DE 49-2, Warnock Aff. ¶ 5.) Warnock is employed by Correctional Medical Services ("CMS") and has been a medical scheduler at Westville for the past five years. (*Id.* ¶ 2.) She is not a doctor, nurse, or medical provider of any kind, nor does she treat or evaluate offenders' medical needs. (*Id.*) Rather, she is a member of the clerical staff whose job is to schedule offenders for appointments after the nursing staff determines that the offender needs to see a doctor. (*Id.* ¶ 3.) Warnock also occasionally assists at Westville's Urgent Care Clinic by answering the telephone. (*Id.* ¶ 6.) When a call comes into the Urgent Care Clinic, Warnock's job is to relay the information about the offender to the charge nurse, who

then makes a determination about whether the offender needs to be brought to the clinic immediately or whether he should submit a request for healthcare through the normal route. (*Id.*) Warnock relays the information from the charge nurse back to the officer calling the Urgent Care Clinic. (*Id.*) Because Warnock is not a medical provider, she cannot treat an offender nor can she determine whether an offender needs to be seen immediately by a doctor or nurse practitioner at the Urgent Care Clinic. (*Id.*)

On December 7, 2008, Green submitted a request for healthcare asking to see a doctor for numbness in his feet and legs. (DE 49-3, Medical Records at 1.) A nurse reviewed this request and referred him to a medical provider for evaluation. (*Id.*) Accordingly, Warnock scheduled Green to be seen by medical staff on December 19, 2008. (*Id.* at 2; DE 49-2, Warnock Aff. ¶ 5.) However, on that date Green's dormitory was on lock-down and per custody staff he could not be moved. (DE 49-3, Medical Records at 2.) The appointment was then rescheduled. (*Id.* at 3.)

According to Green's complaint, on January 2, 2009, an officer called the Urgent Care Clinic twice on his behalf, reporting that he was experiencing pain and numbness in his legs and feet; he alleges that Warnock told the officer "there was nothing anyone could do" and that he should submit a request for healthcare through the normal procedure. (*See* DE 14 at 3.) Warnock has no specific recollection of any such phone calls, but attests that if she was the person answering the phone that day, she would have relayed the information from the officer to the charge nurse, and then relayed back to the officer the nurse's determination regarding whether Green needed to be seen by medical staff immediately. (DE 49-2, Warnock Aff. ¶ 8.) As a clerical staff member, it was not within Warnock's authority to determine whether Green needed to see a doctor on January 2, 2009. (*Id.* ¶ 9.)

2

On January 5, 2009, Green was seen by Dr. Rachel Ross. (DE 49-3, Medical Records at 4.) Dr. Ross observed no apparent cause of the numbness, but she ordered blood work and issued Green a bottom bunk pass. (*Id.* at 4-5.) She directed him to follow up in 21 days if there was no improvement or if the condition worsened. (*Id.* at 5.) Green's blood work was completed on January 7, 2009, and the results were normal. (*Id.* at 6-8.) On January 21, 2009, Green submitted a request for healthcare asking to be seen at an "outside hospital" because he was still experiencing pain and numbness in his lower body. (*Id.* at 8.) Medical staff responded to the request and informed him that he had been scheduled to be seen by the doctor at sick call. (*Id.*)

On February 3, 2009, Green was seen by a nurse practitioner. (*Id.* at 9.) He reported numbness in his lower extremities from his upper thighs down. (*Id.* at 9-11.) The nurse practitioner ordered an x-ray of Green's lumbar spine. (*Id.*) On February 11, 2009, Green underwent the x-ray, which a radiologist found to be normal. (*Id.* at 12.) On February 16, 2009, Green was again seen by the nurse practitioner. (DE 49-4, Medical Records at 1-2.) She ordered additional lab tests and referred Green for a neurological evaluation. (*Id.* at 1.) On February 21, 2009, Green was issued a cane. (*Id.* at 3.)

On March 13, 2009, Green was examined by Dr. Richard Carr. (*Id.* at 5-6.) Dr. Carr noted that Green continued to complain about numbness in his lower extremities, but noted that based on the lab work there was no apparent cause for the numbness. (*Id.*) On April 8, 2009, Green underwent an EMG/Nerve Conduction Study with an outside neurologist, Dr. Nasar Katariwala. (*Id.* at 7-11.) Dr. Katariwala found the results of the study to be normal. (*Id.* at 11.)

On May 13, 2009, Green was again seen by the nurse practitioner with complaints of pain and numbness. (*Id.* at 12-13.) She prescribed him Neurontin for pain. (*Id.* at 13.) On June 5,

3

2009, Green underwent an MRI of his spine, which showed disc degeneration and some spinal cord compression. (*Id.* at 15; DE 49-5, Medical Records at 1.) On July 15, 2009, Green requested to see a doctor. (DE 49-5, Medical Records at 2.) He was seen by a nurse on July 17, 2009, and his bottom bunk pass was renewed. (*Id.* at 3.) On July 28, 2009, Green was seen by the nurse practitioner and reported that the Neurontin was helping his pain. (*Id.* at 5.) The nurse practitioner renewed his bottom bunk pass, and also discussed with him the MRI results, medication management and lifestyle modification, including exercise and healthy diet. (*Id.* at 5-6.)

On October 24, 2009, Dr. Joseph Thompson examined Green. (*Id.* at 8-9.) Dr. Thompson noted that Green's MRI showed some spinal cord compression from facet disease and bony hypertrophy. (*Id.* at 8.) On January 12, 2010, Green saw the nurse practitioner for a chronic care visit. (*Id.* at 10-11.) She renewed his bottom bunk and cane passes. (*Id.* at 11.) Green complained of swelling in his right ankle, and so she issued him an ace bandage. (*Id.* at 12.) She directed him to continue taking Neurontin for pain. (*Id.*) On February 2, 2010, Dr. Thompson examined Green and renewed his Neurontin. (*Id.* at 13-14.) On February 24, 2010, Green was transferred from Westville to another correctional facility. (*Id.* at 16; *see also* DE 6, Notice of Change of Address.)

II. ANALYSIS

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To

4

determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability, a prisoner must show: (1) he had an objectively serious medical need; and (2) the defendant was deliberately indifferent to that need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Deliberate indifference is a high standard, and is "something approaching a total unconcern for a prisoner's welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). As the Seventh Circuit has explained:

> [C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so.

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations omitted). However, correctional facilities are permitted to divide tasks among their employees, and the failure of non-medical personnel to "tell the medical staff how to do its job" cannot be considered deliberate indifference. *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009); *see also Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("[T]he law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so.").

Additionally, although an inmate is entitled to adequate care under the Eighth Amendment, he is not entitled to demand specific medical care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

Green did not file a response to the motion for summary judgment setting forth his own version of events despite being given proper notice of the motion and time to respond. (*See* DE 47.) Therefore, the only document in the record reflecting that an incident occurred on January 2, 2009, involving Green's medical care is his complaint, which is not sufficient to create a genuine issue of fact for trial. *Goodman,* 621 F.3d at 654. Assuming an incident did occur, the undisputed facts show that Warnock was a non-medical staff member who had no power or authority to determine whether Green needed to see a doctor on January 2, 2009. (DE 49-2, Warnock Aff. ¶¶ 2-5.) Warnock was entitled to defer to the medical judgment of the charge nurse, and there is no basis for holding her liable for the fact that Green did not see a doctor on that date. *See Berry*, 604 F.3d at 440; *Burks*, 555 F.3d at 596.

Furthermore, the medical records show that during the time he was housed at Westville, Green received adequate medical care, which included multiple diagnostic tests, regular visits with prison medical staff, a consultation with an outside neurologist, and regular pain medication. (DE 49-3 to DE 49-5, Medical Records.) Based on the record, Green has failed to come forward with evidence from which a reasonable jury could conclude that the defendant was deliberately indifferent to his medical needs. Accordingly, she is entitled to summary judgment.

III.     CONCLUSION

For the reasons set forth above, the motion for summary judgment (DE 46) is GRANTED and judgment is ENTERED in favor of the defendant.

SO ORDERED.

ENTERED: July 7, 2011.

s/William C. Lee<br>William C. Lee, Judge<br>United States District Court